**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HISTORY ASSOCIATES INCORPORATED,
7361 Calhoun Place, Suite 310
Rockville, MD 20855,

Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
550 17th Street, NW
Washington, D.C. 20429,

Defendant.

Case No. 1:24-cv-1857

**COMPLAINT**

Coinbase, Inc., the largest digital-asset trading platform in the United States, retained Plaintiff History Associates Incorporated to submit a Freedom of Information Act ("FOIA") request seeking records from the Federal Deposit Insurance Corporation ("FDIC"). The FDIC denied that request. History Associates now brings this action against the FDIC to compel compliance with FOIA.

**INTRODUCTION**

1. For nearly two years, a wide array of federal financial regulators—including the Securities and Exchange Commission ("SEC"), the FDIC, and the Federal Reserve Board—have used every regulatory tool at their disposal to try to cripple the digital-asset industry. This FOIA lawsuit seeks to bring to light the FDIC's role in that unlawful scheme.

2. In October 2023, a report by the FDIC's own Office of Inspector General ("OIG") revealed that the FDIC had sent letters (the "Pause Letters") to an undisclosed number of supervised financial institutions asking them to pause crypto-related activities—indefinitely. The

OIG report criticized the Pause Letters as inconsistent with previous FDIC guidance on crypto-related activities, and it explained that the letters created a "risk that the FDIC would inadvertently limit financial institution innovation and growth in the crypto space."

3. But there was nothing inadvertent about it. The Pause Letters are part of a deliberate and concerted effort by the FDIC and other financial regulators to pressure financial institutions into cutting off digital-asset firms from the banking system.

4. This playbook is not new. More than a decade ago, under the leadership of the same Chair, the FDIC and other agencies attempted to bully banks into terminating their relationships with payday lenders. Termed "Operation Choke Point" by the regulators, their coordinated assault on a disfavored industry was halted only after a congressional investigation and a successful lawsuit.

5. The FDIC apparently has not learned its lesson. Together with other agencies, it is now mounting Operation Choke Point 2.0—a similar scheme designed to deprive the digital-asset industry of the banking services it needs (like all businesses) to operate in today's economy. The Pause Letters are a critical component of that campaign.

6. Operation Choke Point 2.0, like its predecessor, is unlawful. It is illegal for financial regulators to coerce regulated institutions in secret to cut ties with businesses the government disfavors—particularly those outside the regulators' jurisdiction. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. FDIC*, 132 F. Supp. 3d 98 (D.D.C. 2015). Indeed, the Supreme Court unanimously confirmed just weeks ago that these kinds of regulatory pressure campaigns violate the most basic rights protected by the Constitution. *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316 (2024).

7. To try to pull back the curtain, Coinbase, Inc., the largest digital-asset trading platform in the United States, turned to FOIA—a statute designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

8. Coinbase retained Plaintiff History Associates to submit a FOIA request seeking copies of the Pause Letters. But even though OIG's report had already revealed the existence of the Pause Letters—and had even quoted from them—the FDIC refused to disclose even one word of a single letter. That refusal violated the FDIC's FOIA obligations.

9. History Associates brings this action to compel the FDIC to comply with FOIA.

**PARTIES**

10. Plaintiff History Associates Incorporated is a nationally recognized research and analysis consultancy with expertise in obtaining records through federal FOIA requests, state and local Freedom of Information Law requests, and other sunshine laws.

11. Defendant the FDIC is an agency of the federal government within the meaning of FOIA, 5 U.S.C. § 552(f), and is in possession or control of the agency records sought here.

**RELATED PARTIES**

12. Coinbase, Inc. is the largest and only publicly traded digital-asset trading platform in the United States. It is also a leading provider of financial infrastructure and technology for the crypto economy.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this action under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

14. Venue is proper in this District under 5 U.S.C. § 552(a)(4)(B), which allows a FOIA suit to be brought in "the district court of the United States … in the District of Columbia." Venue is also proper under 28 U.S.C. § 1391(e) because the FDIC resides in the District of Columbia.

## BACKGROUND

15. For the second time in a decade, the FDIC is using its supervisory authority to pressure financial institutions into denying financial services to industries the agency disfavors.

### A. The FDIC And Other Regulators Implemented Operation Choke Point To Try To Shut Down Payday Lenders

16. Around the time Chair Gruenberg took office in 2011, the FDIC, in coordination with the Department of Justice and other federal financial regulators, began leveraging its supervisory authority over financial institutions to "get at payday lending" and other industries that the FDIC does not regulate. *See* Staff of H. Comm. on Oversight & Gov't Reform, 113th Cong., *Federal Deposit Insurance Corporation's Involvement in "Operation Choke Point,"* at 9 (Dec. 8, 2014) ("Staff Oversight FDIC Report"), https://tinyurl.com/yjsdb6fr. As a congressional staff report detailed, "senior policymakers in FDIC headquarters oppose[d] payday lending on personal grounds, and attempted to use FDIC's supervisory authority to prohibit the practice." *Id.* at 8.

17. To that end, the FDIC issued both formal and informal regulatory guidance labeling as "high-risk merchants" payday lenders and other industries the agency disfavored, thereby pressuring banks not to do business with them. FDIC, Supervisor Insights, Managing Risks in Third-Party Payment Processor Relationships at 3, 11 (2011). The FDIC "provided no explanation or warrant for the … 'high-risk'" designations. Staff of H. Comm. on Oversight & Gov't Reform, 113th Cong., *The Department of Justice's "Operation Choke Point": Illegally Choking Off*

*Legitimate Businesses?*, at 8 (May 29, 2014) ("Staff Oversight DOJ Report"), https://tinyurl.com/359t7y83.

18. The FDIC combined that guidance with threats to exercise its enforcement discretion unfavorably towards banks that continued to serve payday lenders and other targeted merchants. A former FDIC Chairman dubbed these actions an "attack on [the] market economy." Staff Oversight DOJ Report at 2 (quoting William Isaac, *Operation Choke Point: Way Out of Control*, Am. Banker (Mar. 21, 2014)).

19. These kinds of government coercion campaigns are unlawful, but they are unfortunately and predictably effective—particularly in the banking industry. The close regulatory supervision the government exercises over banks and the reputational damage that a bank suffers from a government investigation—let alone actual enforcement measures—give financial regulators enormous power to force banks to refrain from perfectly lawful conduct that regulators nevertheless want to eradicate for personal or political reasons.

20. In one recent case, for example, the head of the New York Department of Financial Services allegedly succeeded in pressuring financial institutions to stop doing business with a disfavored industry by merely sending letters "point[ing] to the 'social backlash' against" that industry and "encourag[ing]" "prompt actions" to manage the "reputational risks" of doing business with the industry. *Vullo*, 144 S. Ct. at 1324.

21. It is no surprise, then, that the original Operation Choke Point was effective. The government knew "that banks would be 'sensitive' to the risk of federal investigation," and thus capitulate. Staff Oversight DOJ Report at 9. And that is exactly what happened: Banks big and small closed the accounts of payday lenders. *Id.* at 6.

22. The FDIC halted Operation Choke Point only reluctantly when brought to heel by the public, Congress, and litigation. In 2013, following public reporting on Operation Choke Point, Congress began investigating the program and the FDIC's involvement. Staff Oversight FDIC Report at 17. Using information obtained through the congressional oversight, the targeted industries eventually gathered enough evidence to file a lawsuit challenging Operation Choke Point as a violation of due process and the Administrative Procedure Act. *See Cmty. Fin. Servs. Ass'n*, 132 F. Supp. 3d at 105.

23. Only after the district court refused to dismiss the industry's lawsuit—and after a change in Administration—did the government settle the case and officially end Operation Choke Point.

**B. The FDIC And Other Regulators Are Implementing Operation Choke Point 2.0 To Try To Shutter The Digital-Asset Industry**

24. Now, again under the leadership of Chair Gruenberg, the FDIC has returned to its old ways. The FDIC is again using informal guidance and pressure tactics, in coordination with other federal regulators, to coerce banks to choke off another industry—this time the digital-asset industry.

**1. With Coinbase's Help, Digital Assets Have Grown Into A Transformative, Multi-Trillion-Dollar Industry**

25. Digital assets (also known as "cryptocurrencies," "crypto assets," or "tokens") are computer code entries recorded on a blockchain. A blockchain is a public ledger that records digital-asset transactions on the Internet so that they can be viewed and verified by anyone with an Internet connection. A blockchain is typically decentralized, meaning that no single person or entity operates it.

26. Bitcoin was the first blockchain and digital asset, invented in 2008. Many other blockchains and digital assets, such as Ethereum, have been created since, with capabilities well

beyond peer-to-peer transfers. For example, some digital assets serve as a medium for exchange on applications, function as a digital currency, or help secure digital networks.

27. Digital assets are now a mainstream part of global financial markets, with a market capitalization of around $2 trillion and hundreds of millions of users around the world.

28. Coinbase is the largest and only publicly traded digital-asset trading platform in the United States, serving millions of Americans. It was founded in 2012 to bring economic freedom worldwide by creating a more open, inclusive, and efficient financial system leveraging digital assets and blockchain technology. *See* Brian Armstrong, *Coinbase Is a Mission Focused Company*, Coinbase Blog (Sept. 27, 2020), https://tinyurl.com/2jcmcsxe.

29. Since its founding, Coinbase has been an industry leader in compliance and regulator engagement. Coinbase has been registered as a money-services business with the Financial Crimes Enforcement Network (FinCEN) since 2013; is a member of the federal Bank Secrecy Act Advisory Group; is licensed by the New York Department of Financial Services; and is authorized to transmit money in dozens of States. Coinbase is also a critical partner to law-enforcement agencies around the world, having trained thousands of law-enforcement agents and analysts in blockchain analytics and other cutting-edge investigative techniques.

### 2. The Federal Government Declares War On Crypto

30. Starting around 2022, federal financial regulators have taken concerted steps designed to cripple the digital-asset industry.

31. The SEC, for example, had for years taken the position that it had at most limited authority over digital assets. But starting in 2022, the agency asserted a sweeping and untenable view of its authority over digital assets. Despite repeated entreaties from regulated parties, the SEC has refused to explain (through rulemaking or otherwise) which digital assets it now believes are subject to the securities laws or how digital-asset firms could possibly comply with its existing,

inapt rules. Instead, the agency has launched a scorched-earth enforcement campaign against digital-asset firms designed to run them into the ground.

32. Alongside the SEC's enforcement war, other federal financial regulators are implementing an Operation Choke Point 2.0—a coordinated effort to cut off the digital-asset industry from the banking sector.

33. As before, the FDIC is playing a leading role in this sequel to Operation Choke Point. Along with other banking regulators, the FDIC has issued a series of informal guidance documents describing the purported risks of banking the crypto industry. *See, e.g.*, FDIC, Financial Institution Letter 16-2022: Notification of Engaging in Crypto-Related Activities (Apr. 7, 2022); Federal Reserve, FDIC, & OCC, *Joint Statement on Crypto-Asset Risks to Banking Organizations* (Jan. 3, 2023), https://tinyurl.com/37a3vyst; Federal Reserve, FDIC, & OCC, *Joint Statement on Liquidity Risks to Banking Organizations Resulting from Crypto-Asset Market Vulnerabilities* (Feb. 23, 2023), https://tinyurl.com/36yve8b7.

34. The FDIC is not alone. In 2023, for example, the Federal Reserve issued guidance effectively prohibiting state member banks from holding digital assets on their own accounts and from issuing crypto tokens. Federal Reserve, *Policy Statement on Section 9(13) of the Federal Reserve Act*, 88 Fed. Reg. 7848 (Feb. 7, 2023). And in 2022, the SEC issued Staff Accounting Bulletin No. 121 ("SAB 121"), 87 Fed. Reg. 21015 (Apr. 11, 2022), which makes it prohibitively expensive for financial institutions to hold digital assets on their balance sheets. Bipartisan majorities of both Houses of Congress recently voted to overturn SAB 121 under the Congressional Review Act, but the President vetoed the legislation.

35. Just as in the first Operation Choke Point, moreover, the FDIC and others are sending a clear message that they will exercise their supervisory and enforcement powers against

banks that do business with digital-asset firms. In early 2023, for example, regulators abruptly shuttered Signature Bank—a solvent bank with significant digital-asset customers—and put it into FDIC receivership. The FDIC then required the buyer of Signature Bank to give up the bank's entire crypto business—a move that former Congressman Barney Frank, then a Signature Bank board member, said was meant "to send a message to get people away from crypto." Ed. Bd., *Barney Frank Was Right About Signature Bank*, Wall St. J. (Mar. 20, 2023), https://tinyurl.com/ywxdmrd4.

**C. The FDIC Issues "Pause Letters" To Supervised Financial Institutions**

36. The FDIC's Pause Letters are a critical component of Operation Choke Point 2.0.

37. In October 2023, the FDIC's Office of Inspector General issued a report revealing that, between March 2022 and May 2023, the FDIC sent supervised financial institutions letters asking them to cease all crypto-related activities. OIG, *FDIC Strategies Related to Crypto-Asset Risks* (Oct. 2023) ("OIG Report"), https://tinyurl.com/3kudyyxn.

38. Quoting directly from the Pause Letters, the report stated that the letters instructed institutions to "pause all crypto asset-related activities" and to "not proceed with planned activities, pending FDIC supervisory feedback." OIG Report at 11-12. The Pause Letters also requested information about the banks' crypto-related activities. *Id.* at 5.

39. On information and belief, the Pause Letters were form letters whose content varied minimally from one recipient to another.

40. Although in earlier guidance the FDIC had promised to review banks' crypto-related activities in a timely manner, the agency issued the Pause Letters without a clear timeframe for reviewing the banks' crypto-related activities or allowing banks to un-pause their crypto-related activities. *See* OIG Report at 4, 11-13. The OIG report states that, as of August 2023, only a subset of the institutions that received a Pause Letter had received any feedback on their crypto-

related activities. *Id.* And there is no indication that the FDIC has taken any steps to allow any banks to resume crypto-related activities.

41. The OIG report criticized the FDIC for creating "uncertainty in the [supervisory] process," which "creates risk that the FDIC will be viewed as not being supportive of financial institutions participating in crypto activities." OIG Report at 13. That view, the report explained, "leads to risk that the FDIC would inadvertently limit financial institution innovation and growth in the crypto space." *Id.*

42. Halting the innovation and growth of crypto was in fact the whole point. The Pause Letters weren't a good-faith effort to supervise the crypto-related activities of financial institutions. They were a transparent effort to stop those activities altogether—part and parcel of the FDIC's and other regulators' scheme to cut off digital-asset firms from necessary banking services.

43. Like the first Operation Choke Point, the Pause Letters and the rest of Operation Choke Point 2.0 are an unlawful scheme of government coercion. *See Cmty. Fin. Servs. Ass'n*, 132 F. Supp. 3d at 124; *Vullo*, 144 S. Ct. at 1322. Yet they are having their intended effect. It has become exceedingly difficult for digital-asset firms to obtain banking services. For example, citing "changes in the regulatory environment," Metropolitan Commercial Bank announced in January 2023 that it was closing its digital-asset business. Press Release, *Metropolitan Bank Holding Corp. to Exit Crypto-Asset Related Vertical* (Jan. 9, 2023), https://tinyurl.com/mv5beu52. Before it was shut down, Signature Bank began "paring back its relationships with crypto depositors." Rachel Louise Ensign & David Benoit, *Banks Are Breaking Up with Crypto During Regulatory Crackdown*, Wall St. J. (Feb. 16, 2023), https://tinyurl.com/bdzkmwbk. And banks "that kept their distance from crypto are trying even harder to stay away, closing accounts and shunning customers with potential connections to the industry." *Id.*

### D. FOIA Requires Disclosure Of Government Records

44. "Sunlight is said to be the best of disinfectants." *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (per curiam). To try to shine a light on the FDIC's unlawful conduct, Coinbase turned to FOIA.

45. Congress enacted FOIA "to open agency action to the light of public scrutiny," *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989), and to "ensure an informed citizenry, vital to the functioning of a democratic society," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). FOIA ensures the transparency and accountability "needed" to "hold the governors accountable to the governed." *John Doe Agency*, 493 U.S. at 152.

46. To that end, unless one of nine limited exemptions applies, FOIA requires that federal agencies release information to the public on request. 5 U.S.C. § 552(a)(3)(A).

47. Even if a record falls within a FOIA exemption, the agency still must disclose it unless "the agency reasonably foresees that disclosure would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i). Moreover, when only portions of a record are exempt, the agency is required to "take reasonable steps necessary to segregate and release nonexempt information." *Id.* § 552(a)(8)(A)(ii); *see also id.* § 552(b).

48. Within 20 business days of an agency's receipt of a FOIA request, the agency must "determine … whether to comply" with the request. 5 U.S.C. § 552(a)(6)(A)(i). The agency must "immediately notify" the requester of "such determination and the reasons therefor," as well as "the right … to appeal to the head of the agency" any "adverse determination." *Id.* If an agency determines that it will comply with the request, it must "promptly" release responsive, non-exempt records to the requestor. *Id.* § 552(a)(6)(C)(i).

49. When an agency violates FOIA, federal courts have the power and obligation to correct the agency's unlawful action—and to ensure the accountability and transparency demanded

by Congress. They do so by reviewing the agency's decision de novo and "order[ing] the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). This judicial review makes FOIA more than empty parchment: It empowers and directs courts to hold agencies to Congress's mandate and to protect the "public right to secure such information from … unwilling official hands." *John Doe Agency*, 493 U.S. at 151.

### E. History Associates Requests Copies Of The Pause Letters, But The FDIC Unlawfully Denies History Associates' FOIA Request

50. Coinbase engaged Plaintiff History Associates, a nationally recognized expert in obtaining records through federal FOIA requests, to request copies of the Pause Letters.

51. On November 8, 2023, History Associates submitted a FOIA request seeking copies of all Pause Letters described in the OIG report.

52. On January 22, 2024, the FDIC denied History Associates' FOIA request. The FDIC provided only a conclusory explanation. It stated that the information requested, "if it exists and could be located," would fall under Exemption 4, which applies to "trade secrets, or confidential or privileged commercial or financial information obtained from a person," and Exemption 8, which applies to "information contained in, or related to, the examination, operating, or condition reports prepared by, on behalf of, or for the use of the FDIC in its regulation or supervision of financial institutions." *See* 5 U.S.C. § 552(b)(4), (8).

53. The FDIC further asserted, without any explanation, that "it is reasonably foreseeable that disclosure would harm an interest protected by" a FOIA exemption.

54. Consistent with the FDIC's FOIA regulations, History Associates administratively appealed the FDIC's denial on March 25, 2024.

55. History Associates explained that the FDIC's conclusory invocations of Exemptions 4 and 8 fell far short of meeting the agency's burden of establishing with "reasonable

specificity" that the requirements of the claimed exemptions were met. *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015).

56. Among other problems, History Associates explained that those exemptions are inapplicable to form letters that the FDIC sent indiscriminately to a number of banks. History Associates further explained that no harm would follow from disclosing the Pause Letters. Disclosing the form letters would neither reveal confidential information nor impair the FDIC's relationship with the banks it regulates. And to the extent the Pause Letters contained any bank-specific information, appropriate redactions would eliminate any harm.

57. The FDIC denied History Associates' appeal on May 8, 2024. Apparently recognizing that Exemption 4 does not apply, the FDIC asserted only that the Pause Letters were "part of the examination and supervision of … banks by the FDIC," and thus fell under Exemption 8. The FDIC further asserted that, because in its view the Pause Letters were a "type of record[]" that "would be exempt," there was no need for the FDIC to make any attempt to segregate exempt from non-exempt portions of the Pause Letters.

58. Finally, the FDIC maintained that disclosing the letters would "necessarily reveal information about the particular banks that the letters were sent to and would intrude into the heart of the communications between financial institutions and their regulator." The FDIC did not explain how that could be true if the Pause Letters were form letters. Nor did the FDIC explain why it could not eliminate any such harm through appropriate redactions.

59. Through its thinly reasoned and unlawful denial of History Associates' FOIA request, the FDIC has stonewalled Coinbase's efforts to shine a light on Operation Choke Point 2.0 and financial regulators' attempts to deprive the digital-asset industry of the banking services it needs.

60. Having exhausted its administrative options for obtaining the Pause Letters, History Associates files this timely suit to compel the FDIC to comply with its FOIA obligations.

**COUNT I**

**Violation of FOIA, 5 U.S.C. § 552**

61. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

62. The FDIC is an agency of the federal government within the meaning of 5 U.S.C. § 552(f)(1).

63. The Pause Letters are a record within the meaning of 5 U.S.C. § 552(f)(2).

64. The FDIC violated its statutory duty under 5 U.S.C. § 552(a) by withholding the Pause Letters because they are not exempt from disclosure and because, at a minimum, the FDIC could segregate portions that are not exempt from disclosure.

65. FOIA was designed "to open agency action to the light of public scrutiny." *Tax Analysts*, 492 U.S. at 142. Its purpose is "to provide for open disclosure of public information, and it has long been understood to create a strong presumption in favor of disclosure." *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008) (citations and quotation marks omitted).

66. Although disclosure obligations under FOIA are subject to certain exemptions, in light of FOIA's "goal of broad disclosure, these exemptions have been consistently given a narrow compass." *Tax Analysts*, 492 U.S. at 151; *see also Pub. Citizen*, 533 F.3d at 812.

67. The FDIC on administrative appeal withheld the Pause Letters based solely on FOIA Exemption 8, but that exemption does not apply. Exemption 8 applies only to records that are "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial

institutions." 5 U.S.C. § 552(b)(8). It "address[es] the concern that release of bank examination and operating reports could endanger the fiscal well-being of subject banks." *Pub. Invs. Arb. Bar Ass'n v. SEC*, 771 F.3d 1, 5 (D.C. Cir. 2014) (alterations and quotation marks omitted).

68. Here, the Pause Letters do not "relate[]" to any FDIC "examination, operating, or condition" report. The Pause Letters are a top-down, programmatic FDIC directive unrelated to the supervision process for each recipient bank. The FDIC does not dispute that the Pause Letters are form letters and has not attempted to show that they contain any non-trivial bank-specific information. And the subject of the Pause Letters is the FDIC's purported concerns with digital assets, not the examination, condition, or operation of any particular bank. Moreover, the FDIC sent the Pause Letters not to *regulate or supervise* financial institutions' digital-asset services, but rather to snuff them out.

69. Even if the Pause Letters did contain some information falling within Exemption 8, FOIA requires the agency to produce any "reasonably segregable," non-exempt portion of the records through appropriate redactions. 5 U.S.C. § 552(b). At a bare minimum, the agency must release the portions of the letters that the agency's own OIG report disclosed.

70. In addition, even if the Pause Letters fell entirely within Exemption 8, the FDIC must release them if doing so "would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 105-06 (D.D.C. 2019); 5 U.S.C. § 552(a)(8)(A).

71. The FDIC's conclusory assertion that releasing the Pause Letters would harm the supervisory process does not suffice. The FDIC must explain why these letters *in particular* would cause harm. At the very least, it must explain how any harm could possibly stem from producing the Pause Letters with bank-specific information redacted.

72. History Associates has exhausted its administrative remedies by appealing the FDIC's adverse determination. 5 U.S.C. § 552(a)(6)(A)(ii).

73. By failing to release the Pause Letters, the FDIC has violated FOIA. 5 U.S.C. § 552(a)(3)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief:

a. Declare that the Pause Letters or a reasonably segregable portion of those letters must be disclosed under 5 U.S.C. § 552;

b. Declare that the FDIC violated FOIA by failing to produce the Pause Letters and by failing to reasonably segregate and produce to History Associates any non-exempt portions of the Pause Letters;

c. Order the FDIC to produce by a date certain the Pause Letters or reasonably segregable portions of them;

d. Order the FDIC to produce a *Vaughn* index of any responsive records or portions of responsive records withheld under a claim of exemption;

e. Retain jurisdiction over this case to ensure the FDIC's timely compliance with this Court's orders;

f. Award History Associates its costs and attorneys' fees incurred in this action in accordance with 5 U.S.C. § 552(a)(4)(E); and

g. Grant such other relief as this Court may deem just and proper.

Date: June 27, 2024

Respectfully submitted,

/s/ *Eugene Scalia*

Eugene Scalia, D.C. Bar No. 447524
Jonathan C. Bond, D.C. Bar No. 1003728
Nick Harper, D.C. Bar No. 144707
Aaron Hauptman, D.C. Bar No. 1735525
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-5800
escalia@gibsondunn.com
jbond@gibsondunn.com
nharper@gibsondunn.com
ahauptman@gibsondunn.com

*Counsel for Plaintiff History Associates Incorporated*